Filed 1/9/24  P. v. George CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E081432 |
| v. | (Super.Ct.No. CR57090) |
| LOUIS GEORGE, JR., | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Samuel Diaz, Jr., Judge.
Affirmed.

Jeanine G. Strong, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Daniel Rogers and Vincent P. LaPietra, Deputy Attorneys General, for Plaintiff and Respondent.

1

# I. INTRODUCTION

The procedures governing an incarcerated person's release from prison or jail on specified medical grounds are sometimes called "compassionate release" proceedings. (*People v. Loper* (2015) 60 Cal.4th 1155, 1158.)  Defendant and appellant Louis George, Jr. appeals from the May 31, 2023 superior court order denying his request to recall his state prison sentence and grant him a compassionate release, pursuant to the recommendation of the California Department of Corrections and Rehabilitation (CDCR), underly newly enacted Penal Code section 1172.2.[1]  (Stats. 2022, ch. 744, §§ 1-3, effective Jan. 1, 2023.)

George claims the court erroneously denied his compassionate release request because "undisputed evidence" showed he met both of the statutory criteria for compassionate release:  (1) he has "a serious and advanced illness with an end-of-life expectancy," advanced amyotrophic lateral sclerosis (ALS); and (2) based on his "current physical and mental condition," he will not pose an unreasonable risk of danger to public safety (he is not likely to commit a super strike offense) if he is released.  (§§ 1172.2, subd. (b), 1170.18, subd. (c), 667, subd. (e)(2)(C)(iv) [listing super strike offenses]; *People v. Hoffman* (2015) 241 Cal.App.4th 1304, 1310 [A person poses an unreasonable risk of danger to public safety (§ 1170.18, subd. (c)) if the person is "likely" to commit a super strike offense].)  We affirm the order denying George's request.

---

[1] Undesignated statutory references are to the Penal Code.

At the hearing on the request, the court found George had advanced ALS; thus, the People had the burden to show that George, based on his "current physician and mental condition," posed an unreasonable risk of danger to public safety, that is, George was likely to commit a super strike offense if released. (§ 1172.2, subd. (b).) The People sought to show that, despite his ALS diagnosis, George was both physically and mentally capable of committing and likely to commit a super strike. The People proffered the testimony of a CDCR physician, a CDCR corrections captain, and 3,403 pages of documents concerning George's medical, psychological, and disciplinary histories that the People subpoenaed for the hearing from the CDCR and the Board of Parole Hearings (BPH) (the subpoenaed records).

After the CDCR physician testified about George's current physical condition, the People began questioning the corrections captain about George's mental health and disciplinary histories. When the captain was asked about a conversation between George and a clinician about George's "anger and problems-solving issues," the captain indicated that the conversation was covered by George's physician-patient privilege, and the captain was unaware that George had waived that privilege. George's counsel then objected to the captain answering further questions and refused to waive George's physician-patient privilege to the extent it applied to the captain's testimony and the subpoenaed records, or any evidence of George's criminal and disciplinary histories. Counsel argued that all of the People's proffered evidence was irrelevant and therefore inadmissible on the question of whether George was likely to commit a super strike

3

"based on" George's "*current* physical and mental condition." (§ 1172.2, subd. (b), italics added.)

George's counsel agreed to waive George's physician-patient privilege *to the extent* the privilege covered the CDCR's referral letter, diagnostic study and report, and the testimony of the CDCR physician. George argued *this* evidence indisputably showed that George was both medically qualified for compassionate release and *not likely* to commit a super strike. Thus, George argued that *no additional evidence* was relevant or admissible to the court's determination of whether George was likely to commit a super strike. (§ 1172.2, subd. (b).) The court overruled George's relevancy objections and found the subpoenaed records reliable. But when George's counsel refused to waive George's physician-patient privilege, to the extent the privilege covered the People's proffered evidence, the court had not ruled on the relevancy or admissibility of any of the subpoenaed records and the corrections captain had not completed testifying. Based on counsel's refusal to waive the privilege, the court stopped the hearing, took no further evidence, and denied George's compassionate release request.

George claims the court erroneously denied his request because the CDCR's letter, together with the 59 pages of documents attached to the letter (the CR packet[2]), and the testimony of the CDCR physician, *indisputably* showed that George was entitled to compassionate release. Thus, George claims the court "wrongly believed" that "additional information" namely, the subpoenaed records and the corrections captain's

---

[2] We sometimes refer to the CDCR's letter and the 59-page attachment to the letter as the "compassionate release packet" or "CR packet."

4

testimony, was relevant and admissible on the question of whether George was likely to commit a super strike. We find no merit to this claim.

The court reasonably concluded that the People's right to due process entitled the People to present evidence of George's mental health and disciplinary histories, through the subpoenaed records and the corrections captain's testimony, to show that George was likely to commit a super strike. But the refusal of George's counsel to waive George's physician-patient and psychotherapist-patient privileges, to cover the People's proffered evidence, rendered the court unable to find whether George was likely to commit a super strike based on all of the relevant proffered evidence, including the People's proffered evidence. We agree with the court's conclusion that George's refusal to waive the privileges to cover the People's proffered evidence deprived the People of their due process right to a full and fair hearing on George's request. For this reason, the court properly ended the hearing and properly denied George's request.

George also claims the court prejudicially erred (1) in failing to credit the CDCR's representation that George's sister was willing to allow George to live with the sister and to care for George, and (2) in granting the People's requests to continue the hearing on George's request. We also find no merit to these claims.

## II. FACTS AND PROCEDURAL HISTORY

A. *Compassionate Release Proceedings Under Section 1172.2*

Effective January 1, 2023, Assembly Bill No. 960 (Reg. Sess. 2022-2023) amended the substantive requirements and procedures governing the compassionate release of incarcerated persons. (Stats. 2022, ch. 744, §§ 1-3.) The bill struck nearly all

5

of subdivision (e) of section 1170, the provision formerly governing compassionate releases.  (Stats. 2022, ch. 744, § 1.)  In its place, the bill added a new statute, section 1172.2, to the Penal Code.  (Stats. 2022, ch. 744, § 3.)[3]

Section 1172.2 provides that the "department" (the CDCR) "shall recommend to the court" that the court recall the sentence of an incarcerated person, "if the statewide chief medical executive, in consultation with other clinical executives, as needed, determines" that the incarcerated person satisfies either one of two medical criteria: (1) "[t]he incarcerate person has a serious and advanced illness with an end of life trajectory" which includes, but is not limited to, ALS, or (2) "[t]he incarcerated person is permanently medically incapacitated with a medical condition or functional impairment that renders them permanently unable to complete basic activities of daily living, including, but not limited to, bathing, eating dressing, toileting, transferring, and ambulation, or has progressive end-stage dementia, and that incapacitation did not exist at the time of the original sentencing."  (§ 1172.2, subds. (a), (b)(1)-(2).)[4]  The CDCR's

---

[3]  Section 1170, subdivision (e), now states:  "Notwithstanding subdivision (a), the court may recall and resentence an incarcerated person pursuant to the compassionate release program set forth in Section 1172.2."  (Stats. 2022, ch. 744, § 1.)  Assembly Bill No. 960 (2022-2023 Reg. Sess.) made nonsubstantive changes to section 1170.02, which provides that an incarcerated person is ineligible for compassionate release if the person was convicted of the first degree murder of a peace officer under specified circumstances.  (Stats. 2022, ch. 744, § 2.)  Likewise, an incarcerated person who has been sentenced to life without the possibility of parole or death is ineligible for compassionate release.  (§ 1172.2, subd. (o); former § 1170, subd. (e)(12) [same].)

[4]  Under former section 1170, subdivision (e), incarcerated persons were not medically qualified for compassionate release unless they were either (1) terminally ill, meaning they had an incurable condition caused by an illness or disease that would

*[footnote continued on next page]*

6

recommendation to the court "shall include one or more medical evaluations, a postrelease plan, and findings pursuant to subdivision (b)." (*Id*. at subd. (h).)

"Within 10 days of receipt of a positive recommendation by the [CDCR], the court shall hold a hearing to consider whether the incarcerated person's sentence should be recalled." (§ 1172.2, subd. (c).) "If possible, the matter shall be heard before the same judge of the court who sentenced the incarcerated person." (*Id*. at subd. (i).) "Upon recommendation to the court for recall of sentence, the incarcerated person shall have the right to counsel and, if indigent, the right to appointed counsel." (*Id*. at subd. (k).) "The referring physician or their designees" from the CDCR "shall be available to the court or defense counsel as necessary throughout the recall and resentencing proceedings." (*Id*. at subd. (j).) An incarcerated person "or their family member or designee may independently request consideration for recall and resentencing by contacting the chief medical executive . . . ." (*Id*. at subd. (g).)

At the hearing on a compassionate release request, the court is required to make two findings: (1) whether the incarcerated person satisfies the medical criteria for compassionate release; and, if so, (2) whether the person would pose an unreasonable risk of danger to public safety if released. (§ 1172.2, subd. (b)(1)-(2).) A court's finding that an incarcerated person satisfies the medical criteria for compassionate release gives rise

---

produce death within 12 months, or (2) medically incapacitated, meaning they had a medical condition that rendered them permanently unable to perform activities of basic daily living, and that resulted in their requiring 24-hour total care, and the incapacitation did not exist at the time of original sentencing. (Former § 1170, subd. (e)(2); Legis. Counsel's Dig., Assem. Bill No. 960 (2022-2023 Reg. Sess.) 2022 Stats., Summary Dig., pp. 1-2.)

to "a presumption favoring recall and resentencing," which "may only be overcome if a court finds the defendant is an unreasonable risk of danger to public safety, as defined in subdivision (c) of Section 1170.18, *based on the incarcerated person's current physical and mental condition*." (§ 1172.2, subd. (b), italics added.)[5]

An incarcerated person poses an " 'unreasonable risk of danger to public safety' " within the meaning of section 1170.18, subdivision (c), if there is "an unreasonable risk" that the person will "commit a new violent felony within the meaning of" section 667, subdivision (e)(2)(C)(iv). (§ 1170.18, subd. (c).) These violent felonies are known as super strike offenses or "super strikes." (See, e.g., *People v. Whitmill* (2022) 86 Cal.App.5th 1138, 1150-1151; *People v. Jefferson* (2016) 1 Cal.App.5th 235, 242.) Super strikes are limited to "sexually violent" offenses, specified sex offenses involving minors under 14 years of age, any homicide or attempted homicide offense, solicitation to commit murder, assault with a machine gun on a peace officer or a firefighter, possession of a weapon of mass destruction, and any serious or violent felony punishable in California by life in prison or death. (§ 667, subd. (e)(2)(C)(iv)(I)-(VIII).) A person poses an unreasonable risk of danger to public safety within the meaning of section

---

[5] Under former section 1170, subdivision (e), the court was not authorized to grant a compassionate release request unless the court found that "[t]he conditions under which the prisoner would be released or receive treatment do not pose a threat to public safety." (Former § 1170, subd. (e)(2)(B); *Martinez v. Board of Parole Hearings* (2010) 183 Cal.App.4th 578, 590.) A showing that a person is likely to commit a super strike (see § 1172.2, subd. (b)) is more specific and exacting than a showing that a person poses a threat to public safety.

1170.18, subdivision (c), if it is "likely" the person will commit a super strike. (*People v. Hoffman, supra,* 241 Cal.App.4th at p. 1310.)

In granting a compassionate release request, the court may recall the incarcerated person's sentence or resentence the person. (See § 1172.2, subd. (e) [The CDCR is required to refer its compassionate release recommendation "to the court for recall and resentencing."].) "A recalled sentence is effectively vacated," but "a defendant who is resentenced in order to effect a compassionate release may be subject to parole or postrelease community supervision." (*People v. Torres* (2020) 48 Cal.App.5th 550, 562.) A hearing on a compassionate release request is a sentencing hearing (see *ibid.*); thus, in ruling on the request, the court may consider reliable hearsay evidence. (*People v. Del Rio* (2023) 94 Cal.App.5th 47, 57).

B. *George's Commitment Offenses*

In 1995, George was sentenced to 10 years plus 100 years to life in prison after he was convicted in four counts of first degree robbery, which he committed in 1994 while on parole and with two prior serious felony convictions and two prior strike convictions, namely, 1982 and 1991 convictions for first degree burglary.

C. *The CDCR's Letter and Attachments (The CR Packet)*

Around April 20, 2023, the director of health care services for the CDCR initiated these compassionate release proceedings for George by sending the CR packet to the court, namely, a three-page letter to the court, dated April 20, 2023, together with a 59-page attachment, which included an eight-page "diagnostic study and evaluation report." (§ 1172.2, subd. (h) ["Any recommendation for recall submitted by [the CDCR] shall

9

include one or more medical evaluations, a postrelease plan, and findings pursuant to [§ 1172.2, subd. (b)].".)[6]

The CDCR's letter stated that George, then 65 years old, had advanced ALS, "a serious and advanced illness with an end-of-life trajectory." (§ 1172.2, subd. (b)(1).) The letter explained that ALS is a progressive neurological disorder that causes muscle weakness, disability, and eventually leads to death. Due to "the severity of his condition," George was "already confined to a wheelchair full time and require[d] 24[-]hour nursing support for all of his activities of daily living[,]" including "transfer, feeding, toileting, bathing, and grooming." George was having difficulty swallowing; his speech was "muffled to a point where it is very difficult to understand him"; he used diapers and had a pressure ulcer on his right leg, which required daily wound care; eventually, he would require oxygen and "possibly a breathing tube to maintain his airway." The diagnostic study and evaluation report noted that George's estimated life expectancy was less than one year from March 2023.

---

[6] George asks this court to take judicial notice of the entire CR packet (the CDCR's April 20, 2023 letter and 59-page attachment), even though, at the hearing on George's request, George objected to the court considering all but eight pages of the 59-page attachment, namely, the eight-page diagnostic study and evaluation report. The CDCR's letter is already part of the record. As George points out, the 59-page attachment to the letter was "not made part of the record" even though it was "referenced" in the trial court hearings and was in the "possession" of counsel. Despite George's objection to the court considering the entire 59-page attachment, we grant the request and take judicial notice of the entire attachment, given that it is part of the CDCR's "official act" of recommending George's compassionate release to the court. (Evid. Code, §§ 452, subd. (c), 459, subd. (a); *Rodas v. Spiegel* (2001) 87 Cal.App.4th 513, 518 [Official acts include records, reports, and orders of administrative agencies.].)

10

The CDCR's letter described George's criminal history by noting he was a "fourth term offender" who had been in the CDCR's custody since 1995 based on his four 1994 robbery convictions and prior convictions. The letter noted that George's "arrests and/or convictions" included assault with a deadly weapon, exhibiting a deadly weapon, corporal injury on a spouse or cohabitant, battery, battery on a peace officer or fireman, obstructing or resisting a peace officer, vandalism, burglary, and theft offenses, among other offenses. George had never committed a super strike.

The diagnostic study and evaluation report included a chronology of George's criminal history from 1977 to 1994 and described the circumstances of his 1994 robbery convictions. In a section labeled "institutional adjustment," the report detailed George's "disciplinary history," which included battery causing serious injury in May 2021. The details of this incident were not included in the report. The report also noted that George had numerous prison rule violation reports (RVRs), consisting "mainly" of "disrespect without the potential for violence; disruption; disobeying an order; indecent exposure; and masturbation." George was receiving outpatient mental health services. The report concluded that George had not "adjusted well due to the types of RVRs" he had, which included "multiple RVRs for sexual misconducts," [sic] and George was "not able to remain respectful and compliant towards staff."

Regarding George's "postrelease plan" (§ 1172.2, subd, (h)), the CDCR's letter noted that George was asking to reside with his sister in Hemet. A medical social worker had contacted the sister; the sister was aware of George's medical condition and agreed to care for George and allow George to live with her. But the letter asked the court to

11

"avoid ordering" George's "immediate release to allow CDCR the opportunity to ensure his housing and medical needs are met," and to instead order the CDCR to release George "within 30 calendar days to a location where access to care is available." The diagnostic study and report included a "progress note" dated February 17, 2023, stating "there [was] a viable plan of community care" with George's sister.

The CR packet includes the CDCR's notification to George that the CDCR had initiated proceedings for George's compassionate release (§ 1172.2, subd. (d)); a written waiver, signed by George, of his personal presence at the compassionate release hearing; and another waiver or authorization, signed by George on February 16, 2023, to release "all" of George's health care records to "those involved in recall of sentence including CDCR/CCHCS staff, [George's] legal representative, and the sentencing court." The CR packet also includes George's 1995 abstract of judgment; his 1995 probation report; an "institutional staff recommendation summary" from 1991, detailing George's earlier criminal history; and a "legal status summary" listing George's CDCR history from 1991 to 2023. The last document in the CR packet is a transcript of George's most recent December 8, 2022 hearing before the BPH at which George was denied parole. The BPH found George unsuitable for parole in part because he posed "an unreasonable risk to public safety" based on "evidence in the record of current dangerousness." (See § 3041.)

D. *The Initial Calendaring Delay and Hearing Continuances*

It is unclear when the CDCR sent the CR packet to the court. On May 4, 2023, George's counsel filed a request to "add" George's compassionate release request to the court's calendar for hearing, and the court clerk scheduled a hearing on May 9. In court

12

on May 9, George's counsel explained that the court administration apparently "did not catch the [CR packet] envelope when it came in by messenger from [the] CDCR," ostensibly on April 20, 2023, the date of the CDCR's letter. On May 9, the parties stipulated and the court found good cause to continue the hearing to May 12. (§ 1050, subd. (d).) Before May 9, neither the court nor the prosecutor was aware of George's compassionate release request.

On May 10, 2023, the People filed a motion to continue the hearing from May 12 to June 9. The People argued George had "no right to conclude a compassionate release hearing within 10 days" and asked for a "short continuance" to "adequately evaluate" the request, "gather voluminous relevant records, and inform the court of important information" relevant to whether there was an unreasonable risk that George, despite his physical condition, was likely to commit a super strike if released. The People expressed "grave concerns" about the request because George "continued to be violent, sexually inappropriate, and dismissive of prison rules throughout his lengthy incarceration."

The People also asked for additional time to review "reports pertaining to 26 serious rule violations" and transcripts from the December 2022 BPH hearing in which George was denied parole in part because he posed "an unreasonable public safety risk." The People also said they needed more time to "consider subpoenaing the medical doctors and any other potentially material witness" and to review George's "medical treatment records" for which "a waiver" had been taken. The People noted that, in the only published decision that referenced section 1172.2, namely, *Nijmeddin v. Superior Court* (2023) 90 Cal.App.4th 77 (*Nijmeddin*), the defendant's primary care physician and

proposed caretaker (brother) both testified. Over George's objection, the court continued the hearing from May 12 to May 25.

On May 24, 2023, the People filed an opposition to the compassionate release request, claiming George's conduct in prison had been "replete with violence, sexual misconduct, threats to kill CDC staff members and their families, resisting [corrections] officers, and disrespect." The opposition noted that, in September 2022, a forensic psychologist who interviewed George concluded George met "DSM-V criteria for a diagnosis of antisocial personality disorder" and displayed "predictive factors for violent recidivism." Also in September 2022, George was "discussing getting a job" upon his release from prison. The opposition argued this evidence "call[ed] into question the severity" of George's ALS symptoms and indicated George was "feigning that his condition [was worse] that it currently is." The opposition also noted that, in December 2022, the BPH found George had " 'shown little motivation to cease his criminality' " and that George posed a threat to public safety.

The opposition also questioned the viability of the plan to release George to the care of his sister in Hemet. The opposition noted that, at George's December 8, 2022 parole hearing, George did not tell the panel his sister would provide him with a place to live; instead, he said his sister would provide him with "assistance" and help him "get social security." The sister also lived in a high crime area, and "nothing in" George's available records indicated the sister had "the requisite training and ability" to provide for George's medical needs.

14

In court on May 25, 2023, the court said it had read section 1172.2, the *Nijmeddin* case (90 Cal.App.5th 77), the People's motion to continue the May 12 hearing, the People's opposition to the request, and the CDCR's April 20, 2023 letter. Based on the letter, the court found the presumption favoring release applied "at this time." The next step was to have an evidentiary hearing, where the court would make findings, but the People said they were not ready and asked for a further continuance of the hearing to review records that the CDCR and BPH had recently provided to the court pursuant to the People's subpoenas. The court had received the subpoenaed records on May 24, but the records had not been released to the People. George's counsel noted that the records totaled 3,403 pages and included George's medical and psychological records dating back to 1994. The records also included George's "disciplinary history" with the CDCR.

George's counsel objected to several things: (1) to continuing the hearing to allow the People time to review the subpoenaed records, (2) to the court considering any of the subpoenaed records, and (3) to releasing any of the records to the People. Counsel argued "the vast majority" of the records were "completely irrelevant," and George had a privacy right in his medical and psychological records. Thus, counsel objected to admitting the records at the hearing and to releasing the records to the People, based on George's medical privacy rights under the federal Health Insurance Portability and Accountability Act (HIPPA), and George's psychotherapist-patient privilege. Regarding George's disciplinary records, counsel noted that the CDCR's diagnostic study and report "accurately listed" George's disciplinary history. Counsel asked the court to "at least

15

limit the records that can be used to what's timely or contemporary . . . related to medical and psychological records" because "nothing is relevant to, let's say, before a year ago."

The court said that, "usually in cases like this," it conducted an in camera hearing to determine what, if any, records to redact or refuse to release to the People, but section 1172.2 had a "time-of-the-essence clause"; it stated the matter "shall be heard" within 10 days. (§ 1172.2, subd. (c).) Thus, there was no time for an in-camera hearing; that would "defeat the whole purpose" of the 10-day hearing requirement. But the court said it also had to weigh "equity considerations to all parties, like notice and due process." Thus, the court granted the People access to all of the subpoenaed records and advised George's counsel that if counsel believed a record was irrelevant or should not be admitted, to state the objection at the hearing and the court would make a ruling at that time. The court continued the hearing to May 30.

E. *The Hearing on George's Compassionate Release Request*

The hearing proceeded on May 30 to 31, 2023. The court reiterated its finding based on the CDCR's letter that the presumption favoring compassionate release applied; thus, the People had the burden of proving that George was likely to commit a super strike if released. (§ 1172.2, subd. (b); see *People v. Hoffman*, *supra*, 241 Cal.App.4th at p. 1310.) The court said it would treat the hearing as a resentencing hearing; thus, trustworthy and reliable hearsay would be allowed. The court found the CDCR letter trustworthy and reliable and admitted the letter into evidence. The court did not have a copy of the 59-page attachment to the CDCR letter; only the parties had the attachment, even though the People represented that the CDCR had sent the entire CR packet (letter

16

and attachment) to the parties and to the court. At this point, George's counsel agreed the court could consider the entire 59-page attachment. George's counsel later withdrew that stipulation.

The court ruled it would hear testimony before it received any documentary evidence, including any part of the 59-page attachment to the CDCR letter and any of the subpoenaed records. The court directed George's counsel to meet with the prosecutor "the sooner the better" to discuss what documents were admissible. The court said, "I need a stipulation in writing really quickly."

As their first witness, the People called a CDCR physician and surgeon who had reviewed George's medical records and observed George in early 2023. The physician had never treated or examined George but agreed with the CDCR that George had advanced ALS. George first had ALS symptoms in 2018 and was diagnosed with the disease in 2021 following a nerve conduction study. The physician explained that ALS is a progressive, degenerative neurological disease that is incurable and that eventually causes disability and death. ALS causes muscle weakness, usually beginning in the extremities, and progresses to the muscles controlling speech, chewing, swallowing, and breathing. ALS also causes muscle wasting, poor balance, and paralysis. ALS is at an advanced stage when it affects swallowing. When an ALS patient develops respiratory problems, the patient dies within months.

George's muscles had atrophied to the point he could no longer walk on his own, even with a cane or walker. He had muscle wasting in his hands; his hands were contracted; he could not do "fine motor activities, like writing or picking up a paper," but

17

he could "hold big things."  He was "totally incapacitated"; he could "barely get up" and could "barely move" his wheelchair; he had to be transported to his wheelchair and pushed in it.  He required 24-hour nursing support for his daily activities, including bathing, grooming, and wiping himself.  He did not currently have difficulty swallowing, eating, or breathing, but he had complained of chewing problems.  ALS does not initially affect the brain; thus, George did not have difficulty remembering, understanding, or reasoning.  Through the physician's testimony, the People attempted to show that George was both physically and mentally capable of committing and was likely to commit a super strike if released.  Specifically, the People attempted to show that George could have been misdiagnosed with ALS; even if he was not misdiagnosed, his condition was not as advanced as the CDCR was claiming; he could be exaggerating some of his symptoms; and he had a history, including a recent history, of engaging in physical violence.  The physician agreed it was "possible" that George could have been misdiagnosed and that George could be exaggerating some of his symptoms, but the physician did not think so because George had visible muscle wasting and contractions in his hands.

The People also questioned the physician about George's recent prison rule violations.  In March 2021, George called a nurse a "stupid bitch" and slammed his fist on the nurse's hand when the nurse did not allow him to shower before other inmates.  In May 2021, while in his wheelchair, George broke a correctional officer's finger.  In September 2022, a weapon was found in George's locker.  In November 2022, George physically delayed a peace officer.  At his December 8, 2022 parole board hearing,

18

George told the panel he "lashes out when he doesn't like things." None of these incidents changed the physician's opinion that George had advanced ALS.

The physician's testimony ended on the morning of May 31, 2023. The court then ordered the parties to meet and confer before the afternoon session and enter into a stipulation regarding what documents the court should consider. When the afternoon session began, the prosecutor told the court that George's counsel was now unwilling to stipulate to the court's considering any part of the 59-page attachment to the CDCR's letter. George's counsel was also unwilling to stipulate to admit any of the subpoenaed records. The prosecutor argued that all of the subpoenaed records were reliable because they were supported by custodian of records affidavits. (§ 1561.) The court reminded George's counsel that the hearing was a sentencing hearing and asked counsel whether counsel was willing to stipulate to admit any of the documents included in the 59-page attachment to the CDCR's letter and the subpoenaed records. Counsel said he was not willing to so stipulate, and he did not think it was necessary for the court to consider any of the People's proffered documents. Counsel argued section 1172.2 did not require any of the documents to be considered for the court to make its findings (§ 1172.2, subd. (b)), and that the CDCR physician was the only witness who was required to testify (see § 1172.2, subd. (j)). Counsel also objected that the subpoenaed records contained "multiple levels of hearsay."

The court reiterated its ruling that the matter was a sentencing hearing, and found that all of the subpoenaed records were trustworthy and reliable. The court said it would review all 3,403 pages of the subpoenaed records but agreed with George's counsel that

19

most of the records were irrelevant.  The court explained:  "All I wanted both of you to do was meet and confer, instead of the Court looking at how many times he went to the dentist, how many times he went to the psychiatrist, therapist.  Maybe that's not relevant, I don't know.  But the defense did say time is of the essence."  George's counsel responded, "that's why I don't want the records at all" and argued section 1172.2 was "narrow on what is to be considered."  The court said it was "okay" that George's counsel was unwilling to compromise or stipulate to the relevancy of any of the subpoenaed records.  The court would review all 3,403 pages of the records, but counsel's unwillingness to stipulate would significantly delay the court's decision on George's compassionate release request.

Regarding the 59-page attachment to the CDCR's letter, the prosecutor told the court that a CDCR witness, Ms. M., had confirmed via e-mail that she sent the entire CR packet to the court and the parties; but George's counsel was unwilling to stipulate to that fact.  When the court asked George's counsel why he was unwilling to stipulate to admit the entire CR packet (the letter and 59-page attachment), George's counsel said he did not "have information . . . [that] this whole packet was supposed to go to the court at all."  At this point, the court found the entire CR packet was trustworthy and reliable.  George's counsel then said he was willing to stipulate to the court considering part of the 59-page attachment, namely, the eight-page diagnostic study and evaluation report, dated April 10, 2023, that was mentioned in and attached to the CDCR's letter.  The prosecutor said Ms. M. was due to testify at 3:00 p.m. and could confirm that the entire CR packet was sent to the court and the parties.  Without ruling on the relevancy or admissibility of

any documents, the court proceeded with the hearing, and the People called a CDCR corrections captain to discuss George's "disciplinary history" and mental health records.

After the corrections captain confirmed that George was receiving outpatient mental health services, the People asked the captain whether he was aware that George told a clinician that he needed help with his "anger and problem-solving issues." The captain was not are of the conversation; he believed the conversation would be covered by George's physician-patient privilege, and he was unaware George had waived the privilege. At this point, George's counsel objected, saying he was also "not aware" aware that George had waived his physician-patient privilege.

The court then asked, "What are we doing here then" if George did not waive his physician-patient privilege? The court noted that, if George did not waive the privilege, the court could not consider the testimony of the CDCR physician or the captain; thus, the court could not make the necessary factual findings (§ 1172.2, subd. (b)); and the court would have to "stop the hearing." George's counsel said he knew there were "certain" waivers, "like, for the doctor to testify." The court noted that George had placed his physical and mental health condition in issue through his compassionate release request and the CDCR's recommendation, and George's physical and mental condition were relevant to whether he was likely to commit a super strike if released. The court told George's counsel to decide whether George was waiving the physician-patient privilege.

George's counsel agreed George's physical and mental condition were "relevant" but objected to the court considering any testimony or documents other than the CDCR's

21

letter, the attached diagnostic study and report, and the CDCR physician's testimony. Counsel argued that "these" hearings did not "normally go like this" or take so long (two days) to complete. The court reminded counsel that the physician only testified about George's physical condition; George's mental condition was also in issue; and, because the People had the burden of rebutting the presumption favoring George's release, "under notice and due process, you must give the People an opportunity also to present evidence, to rebut the presumption."

George's counsel then clarified that he was only objecting to the court considering testimony and records concerning George's *past* physical or mental condition on the ground that such evidence was irrelevant to whether George posed an unreasonable risk of danger to public safety (was likely to commit a super strike) based on George's "*current* physical and medical condition." (§ 1172.2, subd. (b), italics added.) Counsel argued, "*Nijmeddin* specifically says it's about the current status of the defendant. So everything we spent two days doing, the vast majority of time was irrelevant to . . . his current physical and mental condition." When asked whether George had signed a written waiver of his physician-patient privilege, George's counsel said George had provided a "medical waiver," but there was no "central file waiver" covering George's disciplinary records or mental health records.

The court explained that it was unable to make the necessary findings under section 1172.2, subdivision (b), unless George waived his physician-patient privilege to the extent the privilege covered George's mental health and disciplinary records, as well as his medical records. The court said it could not consider all relevant information

22

without the waiver and did not think an appellate court would say, "a judge is not entitled at a sentencing hearing to receive relevant information in its decision." The court found George's December 2022 disciplinary records "not too remote" and particularly relevant to George's current mental condition. But, without the waiver, the court said it could not "move forward" with the hearing and make the necessary factual findings based on relevant information about George's current mental condition. Without the waiver, the court said, the hearing would be "over" and the compassionate release request would be denied.

In response to the court's admonition, George's counsel said he was "looking for a decision today" and was "not withdrawing" his objection to the court's considering any of the subpoenaed records, the corrections captain's testimony, or the rest of CR packet— that is, any evidence other than the CDCR's letter, the eight-page diagnostic study and evaluation report, and the CDCR physician's testimony. Counsel argued that the presumption favoring George's compassionate release was not overcome; "there has not been sufficient evidence at all to show [George is] a super strike threat"; he had never committed a super strike; and "sufficient evidence" showed he was entitled to compassionate release. Counsel added that the matter was "way past" the 10-day deadline for holding the hearing on the request.

F. *The Court's Ruling Denying the Compassionate Release Request*

The court concluded the hearing with several observations. First, the court said it had not received any answers to questions it posed at the beginning of the hearing "in regards to a treatment plan" (post release plan) and was inclined to send the matter back

to the CDCR "for a reevaluation for a treatment plan" to ensure George would receive proper care if released to his sister. Second, the People had raised "numerous theories," including "a possibility of misdiagnosis," that George was "embellishing" his symptoms, and that, despite his condition, George was likely to commit a super strike if released. "Because of that," the court said it had to "follow notice and due process" principles and "allow the People an opportunity to present . . . evidence" supporting their theories. But, because George was "objecting to a waiver" of the physician-patient privilege, the court said it was "now in a position" that it could not "make a decision. So, at this time, the motion is denied. The release is denied."

## III. DISCUSSION

George claims section 1172.2 limits the evidence a court may consider in ruling on compassionate release recommendation and request to (1) the information the CDCR sent to the court in support of the recommendation (here, the CR packet), and (2) information provided by the diagnosing CDCR physician or their designee. George also claims the court "wrongly believed" that the People's "additional evidence was relevant and admissible" because the CDCR's letter, diagnostic study, and the physician's testimony indisputably showed that George was both medically qualified for compassionate release and not likely to commit a super strike if released. (§ 1172.2, subd. (b).) George further claims the court was required to credit the CDCR's representations concerning George's post release plan (§ 1172.2, subd. (h)) that George's sister was willing to care for George. Lastly, George claims the court had no authority to grant the People's requests to continue the 10-day hearing on George's request. (§ 1172.2, subd. (c).)

24

We find no merit to any of these claims.

A. *Section 1172.2 Does Not Limit the Evidence a Court May Consider in Determining Whether the Incarcerated Person Is Likely To Commit a Super Strike Based On the Person's Current Physical and Mental Condition*

We begin with George's claim that section 1172.2 limits the evidence a court may consider in ruling on a compassionate release request.

1. Legal Principles

"The proper interpretation of a statute is a question of law we review de novo. [Citations.] ' " ' "As in any case involving statutory interpretation, our fundamental task here is to determine the Legislature's intent so as to effectuate the law's purpose." ' " ' " (*People v. Lewis* (2021) 11 Cal.5th 952, 961.) " '[W]e look to "the entire substance of the statute . . . in order to determine the scope and purpose of the provision . . . . [Citation.]" [Citation.] That is, we construe the words in question " ' in context, keeping in mind the nature and obvious purpose of the statute . . . .' " ' " (*People v Arroyo* (2016) 62 Cal.4th 589, 595.) " 'If there is no ambiguity in the language, we presume the Legislature meant what it said and the plain meaning of the statute governs.' " (*People v. Suazo* (2023) 95 Cal.App.5th 681, 706.)

To recap, section 1172.2 provides that, if the statewide chief medical executive determines that an incarcerated person satisfies the statute's medical criteria for compassionate release (§ 1172.2, subd. (b)(1)-(b)(2)), then the "department" or CDCR "shall refer the matter to the court for recall and resentencing" and "recommend to the court" to recall the person's sentence and release the person. (*Id*. at subds, (a), (e).) The

25

referral is required to include "one or more medical evaluations, a postrelease plan, and findings" pursuant to section 1172.2, subdivision (b). (§ 1172.2 subd. (h).) In addition, the CDCR's "referring physician or their designees" are required to be "available to the court or defense counsel as necessary throughout the recall and resentencing proceedings." (§ 1172.2, subd. (j).) The CDCR is required to refer the matter to the court within 45 days after the person is diagnosed and the matter is referred the chief medical executive. (§ 1172.2, subd. (e).)

The court is required to hold a hearing "[w]ithin 10 days of receipt of a positive recommendation" by the CDCR "to consider whether the incarcerated person's sentence should be recalled." (§ 1172.2, subd. (c).) The court may not grant the compassionate release request unless the court finds (1) the incarcerated person meets the medical criteria for compassionate release, and (2) the person is not likely to commit a super strike if released. (*Id*. at subd. (b).) If the person meets the medical criteria for release, "[t]here shall be a presumption favoring recall and resentencing," and this presumption "may only be overcome if a court finds the defendant is an unreasonable risk of danger to public safety, as defined in subdivision (c) of Section 1170.18, *based on the incarcerated person's current physical and mental condition*." (§ 1172.2, subd. (b), italics added.) If a person is "likely" to commit a super strike, the person poses an unreasonable risk of danger to public safety within the meaning of section 1170.18, subdivision (c). (*People v. Hoffman*, *supra*, 241 Cal.App.4th at p. 1310.)

26

2. <u>Analysis</u>

George argues "the plain and express terms" of section 1172.2 "state that only the inmate's *current* condition is relevant to determining dangerousness . . . ." Indeed, the statute requires the court to determine whether the incarcerated person poses an unreasonable risk of danger to public safety (is likely to commit a super strike), "*based on*" the person's "*current physical and mental condition*." (§ 1172.2, subd. (b), italics added; see *People v. Buford* (2016) 4 Cal.App.5th 886, 913-914 [In resentencing a defendant under the Three Strikes Reform Act of 2012 (§ 1170.126), the focus is on the defendant's current risk of danger to public safety.].) But nothing in section 1172.2 limits the evidence the court may consider in determining whether the incarcerated person is likely to commit a super strike "based on" the person's "current physical and mental condition." (§ 1172.2, subd. (b).) Rather, the statute allows the court to determine what, if any, evidence of the person's past conduct, or past physical and mental condition, is relevant to the person's current physical and mental condition, and to whether the person is likely to commit a super strike based on the person's current physical and mental condition.

George argues "neither the terms" of section 1172.2 "nor its legislative purpose indicates that additional information, beyond what the statue prescribes and pertaining to past conduct, is relevant or admissible" in a hearing on a compassionate release request. George claims "[s]ection 1172.2 does not contemplate challenges to the qualifying medical condition determination by the CDCR's chief medical executive beyond challenges to the 'facts' described in subdivision (b)(1) and (b)(2). For example, there is

27

no provision for the court or either party to obtain outside medical evaluations or seek testimony from private physicians. The Legislature described the supporting material the CDCR was required to submit, namely, medical evaluations, a postrelease plan, and findings pursuant to subdivision (b). (§ 1172.2, subd. (h).) By listing the documents necessary, the Legislature has curtailed additional discovery of other documents. Moreover, the quick 10-day time limit for conducting a hearing makes it clear that additional documentation or witnesses are not contemplated. Had the Legislature intended for an adversarial hearing, it would not have set the time limit so short. [¶] Most importantly, section 1172.2 expressly confines the inquiry to the inmate's current condition. 'Current' means present or now, not six months ago or a year ago."

We disagree with George's interpretation of section 1172.2. We first observe that it is unnecessary to decide whether section 1172.2 limits the court's discretion to consider "outside medical evaluations" or "private physician" testimony. These questions are not before us. Neither the court nor the People (nor George for that matter) sought to adduce such evidence. Instead, the People sought to show, through the testimony of the CDCR physician, the corrections captain, and the subpoenaed records, that George was *currently* both physically and mentally capable of committing and was likely to commit a super strike if released. (§ 1172.2, subd. (b).) Section 1172.2 did not prohibit the People from adducing any of this "additional evidence" to support the People's theory.

To be sure, the timing provisions of section 1172.2 reflect a legislative intent that time is of the essence in concluding a hearing on a compassionate release request. (§ 1172.2, subds. (e) [45-day period for court referral], (c) [10-day period for hearing].)

28

But the statute requires the court to determine whether the incarcerated person (1) meets the statute's medical criteria for release, and (2) poses an unreasonable risk of danger to public safety (is likely to commit a super strike) if released, independently of the CDCR's recommendation and findings on these questions. (*Id*. at subd. (b).) The ostensible purpose of requiring a hearing on a compassionate release referral and request is to allow the People a full and fair opportunity to oppose the request. If the Legislature had intended to limit the evidence a court may consider in ruling on a compassionate release request, we believe the Legislature would have expressly included these limitations in section 1172.2. But the statute contains no such limitations.

Thus, we interpret the "plain language" of section 1172.2 (*People v. Suazo*, *supra*, 95 Cal.App.5th at p. 706), in light of its " ' " 'nature and obvious purpose' " ' " (*People v Arroyo*, *supra*, 62 Cal.4th at p. 595), as not limiting the court's discretion to consider evidence *in addition to* the CDCR's referral and accompanying documents, including the CDCR's medical evaluations, postrelease plan, and findings (*id*. at subds. (a), (h)), and input from the referring CDCR physician or designee (*id*. at subd. (j)). In sum, section 1172.2 allows the court to determine whether and to what extent to consider "additional evidence," beyond what the CDCR has provided to the court, in ruling on a compassionate release request.

B. *The Court Properly Allowed the People To Adduce the Subpoenaed Records from the CDCR and the BPH, and the Testimony of the CDCR Physician and the Corrections Captain, To Show George Was Likely To Commit a Super Strike If Released*

George claims the CR packet and the CDCR physician's testimony indisputably established his eligibility for compassionate release by showing he was both medically qualified for release and not likely to commit a super strike if released. (§ 1172.2, subd. (b); *People v. Hoffman*, *supra*, 241 Cal.App.4th at p. 1310.) Thus, George claims the court "wrongly believed" the People were entitled to offer "additional evidence" of his "past" conduct on whether he was likely to commit a super strike. (*Ibid.*) For example, George argues, "events occurring in March and May of 2022, when George was able to use his hands, or in November and December of 2022, are not relevant" to whether George was currently likely to commit a super strike.

To the extent George is claiming that the court abused its discretion in allowing the People to proffer the subpoenaed records and the corrections captain's testimony, we find no abuse of discretion. "The trial court has considerable discretion in determining the relevance of evidence." (*People v. Williams* (2008) 43 Cal.4th 584, 634.) All relevant evidence is admissible except as otherwise provided by statute. (Evid. Code, § 351; *People v Clark* (2011) 52 Cal.4th 856, 892.) " 'Relevant evidence' " is evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210; *People v. Garceau* (1993) 6 Cal.4th 140, 177 ["The test of relevance is whether the evidence tends 'logically, naturally, and by reasonable inference,' to establish material facts . . . ."].) We

30

review a trial court's exercise of discretion in admitting or excluding evidence for abuse, and we will not disturb the court's ruling, "except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10.)

As the court observed, the People had a due process right to challenge the CDCR's compassionate release recommendation by showing that George was not medically qualified for release and was likely to commit a super strike if released, based on George's current physical and mental condition. (§ 1172.2, subd. (b); see Cal. Const., art. I, § 29; *People v. Sutton* (1993) 19 Cal.App.4th 795, 803 ["[T]he central meaning of procedural due process is that parties whose rights are to be affected are entitled to be heard at a meaningful time and in a meaningful manner."].) Through the subpoenaed records and the testimony of the CDCR physician and the corrections captain, the People tried to show that George's current physical and mental conditions were such that he was currently both physically capable and mentally disposed to commit a super strike if released. (§ 1172.2, subd. (b).) The People's offer of proof was focused and specific and presenting it to the court was not likely to consume an inordinate amount of court time. (Evid. Code, § 352.) Thus, the court did not abuse its discretion in allowing the People to present their theory that George was likely to commit a super strike through the subpoenaed documents and the proffered testimony.

George claims that all of the People's proffered evidence was irrelevant because it concerned George's *past* behavior. But this mischaracterizes the People's evidence. The People were focused on George's more recent disciplinary history and the violent acts

31

George committed in 2021 and 2022, not violent acts George committed years earlier. Further, a person's past conduct is neither necessarily nor categorically irrelevant to the person's current physical and mental condition. To the contrary, "[e]vidence of past conduct may be probative of current conditions." (*In re D.L.* (2018) 22 Cal.App.5th 1142, 1146.) Thus, an incarcerated person's criminal, disciplinary, and mental health history may be relevant to the person's current physical and mental condition, and whether, based on those conditions, the person is likely to commit a super strike. " ' "[T]he relevant inquiry is whether [a petitioner's prior criminal and/or disciplinary history], when considered in light of other facts in the record, are such that they continue to be predictive of current dangerousness . . . . This inquiry is . . . an individualized one, and cannot be undertaken simply by examining the circumstances of the crime in isolation, without consideration of the passage of time or the attendant changes in the inmate's psychological or mental attitude." ' " (*People v. Buford*, *supra*, 4 Cal.App.5th at p. 914, quoting *In re Shaputis* (2008) 44 Cal.4th 1241, 1254-1255.)

An inmate's "past and behavior are relevant only insofar as they relate to the safety risk, if any, that the inmate's release would pose." (*People v. Torres, supra,* 48 Cal.App.5th at p. 559 [discussing the scope of the court's discretion to determine whether an incarcerated person poses a "public safety" risk under former § 1170, subd. (e)].) And, a "generalized concern" that the person is able " 'to continue to commit crimes' " is insufficient to support a finding that the person is likely to commit a super strike "based on" the person's " 'current physical and mental condition.' " (*Nijmeddin*, *supra*, 90 Cal.App.5th at p. 83.) But here, the People were not attempting to present extensive

32

evidence of George's physical and mental health history. Rather, the People were attempting to show George was likely to commit a super strike based on George's current physical and mental condition, and George's more recent disciplinary and mental health histories.

George points out that the "primary" purpose of compassionate releases under section 1172.2, as under former section 1170, subdivision (e), is to save the state the costs of the inmate's medical care, not to "reward an inmate for good behavior." (See Assem. Floor Analysis, Conc. in Sen. Amend. of Assem. Bill No. 960 (2022-2023 Reg. Sess.), as amended Aug. 16, 2022, p. 3;[7] *Martinez v. Board of Parole Hearings*, *supra*, 183 Cal.App.4th at pp. 590-591 [The purpose of former § 1170, subd. (e), was to save the state the costs of the inmate's medical care.]; *People v. Torres*, *supra*, 48 Cal.App.5th at pp 556-557 [same].) George argues that the legislative purpose of section 1172.2, to save the state money, "leaves no doubt that an inmate's pre-disability behavior is of little, if any, relevance to the section 1172.2 analysis." We disagree. An incarcerated person's past behavior is generally relevant to the person's current physical and mental condition, and whether, based on those conditions, the person is likely to commit a super strike if released. (§ 1172.2, subd. (b).)

---

[7] We grant George's request to take judicial notice of the Assembly Floor Analysis of Assembly Bill No. 960 (2022-2023 Reg. Sess.), as amended Aug. 16, 2022. (Evid. Code, § 452, subd. (c) [A court may take judicial notice of the official acts of the legislative department of any state.]; Evid. Code, § 459, subd. (a) [A reviewing court may take judicial notice of any matter specified in Evid. Code, § 452.].)

C.  *The Trial Court Properly Denied the Compassionate Release Request After George*

*Refused To Waive His Physician-Patient Privilege To Cover the People's Evidence*

George claims "the court concluded that unless the parties reached a stipulation as to which" documents were relevant and admissible at the hearing, the court could not rule, and did not rule, on whether George was likely to commit a super strike.  This misstates the record.  The court did not rule on the question of whether George was likely to commit a super strike—not because George's counsel refused to stipulate to the relevancy and admissibility of any of the subpoenaed records, or the entire CR packet— but because George's counsel refusal to waive George's physician-patient privilege, or more accurately his physician-patient *and* psychotherapist-patient privileges (Evid. Code, §§ 994, 1014),[8] to the extent the privileges applied to the subpoenaed records and the captain's testimony.

The People point out that George's counsel was mistaken in believing George had not waived his physician-patient privilege before the May 30-31, 2023 hearing.  The CR

---

[8]  Evidence Code section 994 makes privileged a communication between a physician and a patient, if the privilege is claimed by the patient.  But the privilege does not apply " 'as to a communication relevant to an issue concerning the condition of the patient if such issue has been tendered by' " the patient, or a party claiming through or under the patient.  (Evid. Code, § 996; *In re R.R.* (2010) 187 Cal.App.4th 1264, 1278.)  This patient-litigation exception is justified for two reasons:  (1) "since the patient has put" the patient's medical condition "into issue," the patient " 'may no longer justifiably seek protection from the humiliation of its exposure' "; and (2) "in all fairness, a patient ought not to be allowed to establish a condition without a full inquiry into the circumstances."  (*In re R.R.*, at p. 1278.)  Evidence Code section 1014 makes privileged a confidential communication between a psychotherapist and a patient, if claimed by the patient, but this privilege is also subject to the patient-litigation exception.  (Evid. Code, § 1016.)

34

packet includes a waiver, signed by George on February 16, 2023, authorizing the CDCR to release "all" of George's health care records to "[t]hose involved in recall of sentencing including CDCR/CCHCS staff, [George's] legal representative, and the sentencing court." The waiver encompasses George's "medication assisted treatment records," "mental health treatment records," and "substance use disorder records." Thus, by signing the waiver, George waived his physician-patient and psychotherapist-patient privileges in these compassionate release proceedings.

The People claim that, if George's counsel had provided the entire CR packet, including the waiver, to the court, the court could have reviewed the waiver and overruled George's objection to the court's considering any of the subpoenaed documents or the captain's testimony, based on George's failure to waive his physician-patient or psychotherapist-patient privileges, to the extent the privileges covered the People's proffered evidence. We disagree.

It must be remembered that George's counsel was claiming that most of the CR packet, including the waiver, was irrelevant and unnecessary to the court's determination of whether (1) George was medically qualified for compassionate release and (2) was likely to commit a super strike if released. In any event, George's counsel retracted or at least limited George's February 16, 2023 waiver when counsel invoked George's HIPPA (medical privacy) and physician-patient privilege in objecting to the court considering any of the subpoenaed documents or the captain's testimony. It was not for the court to second-guess George's counsel's implicit representation that George had authorized

George's counsel to retract or limit the waiver contained in the CR packet, or any other waiver that may have rendered privileged the People's proffered evidence.[9]

The court correctly recognized that, without the necessary waiver of George's applicable physician-patient and psychotherapist-patient privileges (Evid. Code, §§ 994, 1014), the court was unable to determine whether George was likely to commit a super strike based on all relevant proffered evidence, including the subpoenaed records and the captain's testimony. Although the court found that all of the subpoenaed records and the entire CR packet were reliable, and therefore admissible, the court did not admit any of the records, or the entire CR packet, and ended the hearing before the captain completed testifying. This was proper because, without the waiver, the court could not consider any of the subpoenaed records or the captain's testimony to the extent records or testimony was privileged. (Evid. Code, §§ 994, 1014.)

---

[9] At oral argument, George's appellate counsel conceded that George's trial counsel erred in purporting to retract or limit George's waiver of George's physician-patient and psychotherapist-patient privileges, but appellate counsel argued that Evidence Code sections 912 and 996 "made it impossible" for trial counsel to retract or limit the waiver. We disagree. Under these statutes, the physician-patient and psychotherapist-patient privileges are waived with respect to communications that the holder has previously disclosed or consented to allow another to disclose (Evid. Code, § 912, subd. (a)), and the privileges do not apply to communications that are relevant to issues concerning the patient's condition, when the patient has "tendered" or placed the condition in issue. (Evid. Code, § 912, subd. (a).) By seeking George's compassionate release, the CDCR and George placed George's current physical and mental condition squarely in in issue. But, as the trial court indicated, nothing prevented George, through his trial counsel, of retracting George's waivers of his physician-patient and psychotherapist-patient privileges before the compassionate release proceedings concluded. That meant, however, that the court could not rule on George's compassionate release request based on all relevant proffered evidence.

George claims the court erroneously denied his compassionate release request because the CR packet and the CDCR physician's testimony indisputably showed he was both medically qualified for release and not likely (or physically able) to commit a super strike if released. George claims that section 1172.2 "establishes clear eligibility criteria," which means the court's "discretion is not unfettered when evidence is presented satisfying the statutory criteria." (*People v. Loper* (2015) 60 Cal.4th 1155, 1161, fn. 3.) But the evidence supporting the CDCR's recommendation for George's compassionate release was neither undisputed nor indisputable.

Through the testimony of the CDCR physician, the People showed George could still hold large objects with his hands. This evidence, together with George's relatively recent history of sexual misconduct and violent acts in prison (he broke a corrections officers' finger in May 2021) indicated that George was both physically capable of committing and likely to commit a super strike—for example, a forcible lewd act with a child under 14 years of age. (§§ 288, 667, subd. (e)(2)(C)(iv)(II), 1170.18, subd. (c), 1172.2, subd. (b).) The People were unable to present their entire case, however, and the court never ruled on whether George was likely to commit a super strike because, by limiting George's physician-patient and psychotherapist-patient privileges to cover only the CDCR's letter, the diagnostic report, and the physician's testimony, George's counsel prevented the court from making its findings based on a full and fair record.

D. *George's Claim Concerning* the *CDCR's Postrelease Plan Lacks Merit*

George claims that, to the extent the court found the CDCR's postrelease plan for George inadequate, the court erroneously failed to credit the CDCR's representation that

George's sister told CDCR staff that she was willing to allow George to live with her and that she would care for George. George claims the court was required to credit the sister's statement, under Evidence Code section 664, which provides, " 'It is presumed that official duty has been regularly performed.' "

The court was not required to credit the sister's statement. At most, Evidence Code section 664 created a rebuttable presumption that a CDCR staff person spoke with the sister, in discharging the CDCR's official duty to formulate a release plan for George, and that the sister made the statements, as the CDCR's letter stated. (See *Gerwig v. Gordon* (2021) 61 Cal.App.5th 59, 64.) But the court was not required to presume, much less find, that the postrelease plan was adequate or that the sister was able to properly care for George, based solely on the sister's statement, without any consideration of her home or her time and ability to care for George in light of his diagnosis.

Indeed, the CDCR's letter indicated that placing George with his sister was not a viable release plan for George when the letter was issued on April 20, 2023. In the letter, the CDCR asked the court to delay ordering George released for a period of 30 days "to allow [the] CDCR the opportunity to ensure his housing and medical needs are met." Thus, the CDCR did not have a viable release plan for George when the CDCR recommended that the court approve George's compassionate release.

Ultimately, the court did not make findings concerning the adequacy of the release plan. The question was moot after George's counsel retracted George's physician-patient and psychotherapist-patient privileges to the extent the privileges applied to the People's proffered evidence. Nonetheless, the court was right to question the viability of the

38

release plan. Releasing George into a high-crime area, with no assurance that George would receive adequate medical care, could have affected the likelihood that George would commit a super strike following his release.

E. *The Court Properly Continued the Section 1172.2 Hearing at the People's Requests*

George claims that the 10-day period for holding a hearing on a compassionate release request (§ 1172.2, subd. (c)) is "mandatory" and, therefore, does not permit the court to continue the hearing beyond the 10-day period. (See § 1050, subds. (d), (e) [The court may continue a criminal matter for good cause shown.].) Thus, George argues that the court erroneously continued the hearing several times, pursuant to the People's requests, from May 9, 2023, ultimately to May 30-31.

Section 1172.2, subdivision (c), provides: "Within 10 days of receipt of a positive recommendation by the [CDCR], the court *shall hold a hearing* to consider whether the incarcerated person's sentence should be recalled." (Italics added.) George notes that, when used in a statute, "the word 'shall' . . . is ordinarily deemed mandatory," and the word " 'may' " is ordinarily deemed "permissive." (*California Correctional Peace Officers Assn. v. State Personnel Bd.* (1995) 10 Cal.4th 1133, 1143.) But this "ordinary" rule does not apply to section 1172.2's 10-day time limit for holding a hearing. (§ 1172.2, subd. (c).)

Time limits are usually deemed discretionary, not mandatory, unless the Legislature clearly expresses a contrary intent. (*Seibert v. City of San Jose* (2016) 247 Cal.App.4th 1027, 1039.) Time limits are deemed mandatory when the statute prescribes a consequence or penalty for the failure to act within the prescribed time.

39

(*California Correctional Peace Officers Assn. v. State Personnel Bd.*, *supra*, 10 Cal.4th at

p. 1143.) Section 1172.2 does not prescribe any consequence or penalty for failing to

hold a hearing on a recommendation for a compassionate release within 10 days of the

date the court receives the recommendation. For example, the statute does not provide

that a compassionate release recommendation and request must be granted or denied

unless a hearing on the request is held within 10 days of the date the CDCR submits the

recommendation to the court. (See *Seibert v. City of San Jose*, at p. 1039.)

Further, section 1050 authorizes the court to continue a hearing in a criminal

matter for good cause shown. (§ 1050, subds. (d), (e).) Nothing in the text of section

1172.2 or its legislative history indicates that the Legislature intended *to not allow* a

section 1172.2 hearing to be continued for good cause shown under section 1050. And,

because section 1172.2 prescribes no consequence or penalty for failing to hold a hearing

within the 10-day time period (§ 1172.2, subd. (c)), the Legislature ostensibly intended to

allow the courts to continue such hearings upon a showing of good cause (see *Siebert v.

City of San Jose*, *supra*, 247 Cal.App.4th at pp. 1038-1040).[10]

---

[10] Former section 1170, subdivision (e)(3), contained a 10-day hearing
requirement in substantially the same language as its replacement statue, section 1172.2,
subdivision (c). (See *Martinez v. Board of Parole Hearings*, *supra*, 183 Cal.App.4th at p.
588.) We have found no case holding that the former 10-day hearing provision was
mandatory, rather than discretionary. Thus, by reenacting the 10-day hearing
requirement, without substantive change, in section 1172.2, subdivision (c), the
Legislature ostensibly intended that the new 10-day hearing requirement would be
discretionary, not mandatory, and subject to continuance for good cause shown. (§ 1050,
subds. (d), (e).)

Thus, the 10-day hearing requirement of section 1172.2, subdivision (c), is discretionary, not mandatory, and a hearing on a compassionate release request may be continued for good cause shown.  (§ 1050, subds. (d), (e); *People v. Johnson* (2013) 218 Cal.App.4th 938, 942 ["Whether good cause exists is a question for the trial court's discretion but requires at a minimum that the party seeking continuance demonstrate it has prepared for the hearing with due diligence"].)  To the extent George claims the trial court abused its discretion in continuing the hearing several times at the People's requests, we find no abuse of discretion.

First, George agreed to continue the hearing from May 9, 2023 to May 12.  Thus, George consented to the setting of the case on that date.  (*People v. O'Leary* (1955) 130 Cal.App.2d. 430, 436 [Failure to object to a date beyond the statutorily prescribed date constitutes consent to that date].)  At a minimum, George invited any error in the May 9 to May 12 continuance.  (See *People v. Holmes*, *McClain and Newborn* (2022) 12 Cal.5th 719, 821-822.)  Second, all of the subsequent continuances, from May 9 to May 12, May 12 to May 25, and May 25 to May 30, were supported by a showing of good cause.  The continuances were brief and necessary to allow the People to prepare for the hearing by obtaining and reviewing the subpoenaed records and arranging for the CDCR physician and captain to testify.

## IV.  DISPOSITION

The May 31, 2023 order denying George's request to recall his sentence and grant him a compassionate release from state prison is affirmed, without prejudice to the CDCR or George filing an updated compassionate release request.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

FIELDS                          
J.

We concur:


CODRINGTON             
      Acting P. J.


RAPHAEL                   
      J.